Next case please. Counselor, you may proceed. Good afternoon, good afternoon, your honors. Alan Blum on behalf of the widow, plaintiff, appellant. It's been a long day for everybody. I will try to be right to the point like I usually am. This is a death case. It was denied from arbitration through the commission, even though they didn't render a decision. Circuit court affirmed the commission didn't write a specific opinion. And this is a manifest weight case. And the widow is hoping that you will determine, and hopefully I can make an impact on all of you, that there is no sufficient evidence anywhere in this record to affirm the commission's denial of compensability. I first want to address what the defendants' evidence established and what it didn't. They haven't been medically established. Who is the burden in this case? I do, but I want to work backward, your honor, if I can. Well, if the defendant has no burden, then what would be what their evidence didn't establish, what would be the relevance of that? I will show the overwhelming evidence in this record is actually better than a preponderance of evidence, establishing that the freon exposure from the decedent that he inhaled on June 17, 2005, was a causative factor in precipitating and inducing a cardiac arrhythmia, wherein he died within minutes after being exposed to it for about two hours in his unsafe garage and using completely unsafe shutoff valves that did not prevent freon from being expelled out of those hoses every time he made a disconnection. The case has been brought in by the arbitrator, which I believe is completely erroneous, and even within his decision points out he didn't have an understanding of what this technical freon refrigeration process is, because in it he makes a note in his decision that the autopsy did not find any evidence of freon in the decedent's body following his death, but both medical experts clearly opined that you are never going to see any level of freon in a person who is exposed to freon within 60 minutes after the exposure, because it precipitates out. That is one crucial error. The second crucial mistake is the arbitrator, which was adopted by the commission with no decision, stated that the plaintiff failed to prove what level, if any, the decedent was exposed to in order to meet the threshold under the EPA guidelines. However, both doctors have said those EPA guidelines are only guidelines. There are exceptions that apply, especially to people who are sensitive to freon, many of which are, especially the plaintiff's medical expert who said it is undisputed he had an enlarged heart, and a person who has an enlarged heart can be susceptible to many stimulants, including freon, that can kill a normal person in sufficient quantities. Let me see if I can call out, obviously this is a tragic case and you're very passionate about this, but I'm trying to call out what would be an objective standard that has to be established here. There's no question he died tragically. He had a preexisting condition. There's no question he was exposed to freon. But I think the question we're probably wondering about, doesn't there have to be some quantum of showing an exposure to some type of a harmful level? I will get to that. Precisely, precisely, the Supreme Court in our state, and it is still the law, death is compensable when the employment is a causative factor in producing death, not the sole cause, not the principal cause. And I admit, if the plaintiff was required to have the burden of proof, principal cause or sole cause, the exact amount of freon would be crucial. But the law does not require the plaintiff the burden to prove the sole or principal cause. It's a cause. And if one of the causes contributes, like this freon exposure, it's compensable. As to Justice Hudson's concerns, then what is the evidence that he was exposed to freon sufficient to constitute a cause of his death? Okay, perfect. We know with engineering certainty from only one engineer in this case, Mr. Ferroni, he breathed some or all of that freon contained in the hose each and every time he made a disconnection to an empty recovery bag, which his testimony was based on, the widow's undisputed testimony, that she observed her husband go into the garage that evening carrying in three recovery bags full of freon. Approximately two hours later, while he still stayed there, she observed him leave the garage carrying out three empty recovery bags. There is only one reasonable inference that can be drawn in this manner. As a matter of law, by carrying out three empty bags, going in with three full bags, the decedent had to make at the minimum three disconnections in order to empty the first recovery bag, then hook up his unsafe hose to the second bag, empty it, disconnect it again, hooking it to the third bag, emptying that, and disconnecting that hose without the shutoff valves so he could carry out three empty recovery bags. Within minutes, he went to his van with the three empty recovery bags, parked the car, walked up the driveway, went into the house through the kitchen, went into the living room, and collapsed and died of cardiac arrhythmia. There is no dispute about that. Our medical expert said, based on the widow's testimony, based on the engineer's certainty, engineer's certainty that he breathed some or all of the freon in each and every hose every time and remained in the garage, which was obvious upon his initial inspection, that that garage is unsafe for the handling of freon. There is no ventilation in the roof. He's in the back of the garage. You can see by the photos, three walls surrounding him, even with the garage door open. He is there with a heavy gas. It's undisputed. He's remaining after the first disconnection. Another 40 minutes, he gets another whiff. He's holding it with his arm. He disconnects it. It's going to be under pressure. That is all undisputed. The defense person who did the test for Sears in defense of their own litigation, he doesn't have hoses without shutoff valves. Who would? What stupid person would be exposed and who would want to breathe freon? And what I'm trying to say, this decedent was stupid, and he was negligent. He never should have been using unsafe hoses. Maybe he didn't know about his garage being unsafe, but those hoses should have had shutoff valves to keep that freon contained because that's the purpose. But does stupidity and negligence prevent a workers' comp case? If that freon was a triggering agent that precipitated his enlarged heart, it caused an inducement with sudden death with a cardiac arrhythmia, then the law of CISPRO controls this matter. His enlarged heart was ready to go at any time from the susceptibility of that preexisting condition being he was exposed to this freon and it knocked him out. Now, I want to please go to the confusing screen of the defense. Three and a half years later, what they tried to pull off up to now they have. But I am hoping this court is going to recognize it was a sham. What did their test do? They came in with a lead bag full of freon, collected it in their own warehouse, never certified. They brought it in. We'll assume that it was really freon. They took the decedent's hoses without shutoff valves. One end went to the recovery bag, the other to the evacuation pump, the output of the evacuation pump, his second hose without shutoff valves, to the cylinder. The man flipped the switch on. He had a hygienist there. He monitored. Forty minutes. That's what the report said. Even though they're alleging they did two of them, I don't see it. I don't care if they did or they didn't. Forty minutes to evacuate one bag. There is no measurable, the tiniest little amount of freon. Only after the bag was empty, the defense employee, Mr. Wistman, went over to the cylinder and bled off the line so that the pressure in the hoses went away. The test was over. They never made a disconnection. From the decedent's hose to the recovery bag, the empty bag. You know why? Because they didn't want to get a reading. Because that hose, even though the bag was empty, according to the engineer, according to Mr. Wistman, I crossed examination in this case, when you don't have a shutoff valve, that hose still is under pressure. It's going to spill out whatever's in there, and it's going to come out into the room. So what did their test establish, if anything? It established there was no leak in the hoses. There was no leak in the pump. There was no leak in the cylinder. There's no defect. But this isn't a product liability case. And in my brief, I pointed out, we've never alleged a product liability case. This is a cop case. It's the dangerous hoses that is the crucial issue, which the defense never addressed because they were smart and cunning and they pulled it off in front of the commission. I don't think you guys are going to let that happen. And did he die within minutes? Yeah. After being exposed to that Freon? Yes. But did he die two days later? No. 24 hours later? Did he get the cardiac arrhythmia 10 hours later? No. He finished, he put the stuff, he came back. And the medical expert, Dr. Krugel, knowing the widow's testimony, knowing what the engineer said, knowing what Freon can do, knowing what the enlarged heart can make somebody susceptible, he didn't say it's just likely that this Freon was the precipitating triggering agent. He said it was highly likely. And it brings me to the point, if the defense's test has no probative value other than showing there's no leaks in the hoses and it didn't address the unsafe shutoff, then the medical expert, Dr. Krugel, on behalf of the defense, has no weight either. So there is no weight if you find that the test proved nothing other than there's no product defect. But the plaintiff did prove, we proved that it was highly likely by competent medical testimony, engineering certainty, and only one reasonable inference on the night of June 17, 2005, that this decedent had to make three disconnections in order to evacuate each and every recovery bag. I thank you. I will rest right now for opposing counsel, unless you have some questions for me. I don't believe there are. Thank you, counsel. May it please the Court, Mr. Blum. My name is Ralph Berkey. I represent Sears Roebuck. I neither tried this case nor wrote the brief. The attorney who did so has left our firm. Opposing counsel correctly frames this case as one of manifest weight of the evidence. We are driven then to the familiar test under manifest weight, which you've heard all too many times, that you cannot reverse unless the industrial commission's decision offends the clearly evident, plain, and indisputable evidence. You're also charged to give particular deference to the commission on medical questions. We believe the manifest weight of the evidence favors the employer, and the decision of the arbitrator, the commission, and the circuit court should be affirmed. That's where the case was tried. My friend is re-presenting the facts to you as if this were the trial court. He had his chance. He asserts that Freon caused a cardiac event in arrhythmia that killed Mr. Fisher on June 17, 2005. There was a recreation of the conditions that existed on that day. Remarkably, the widow retained all of this equipment in pristine condition in the garage. It was not until some four years later that there was a test. All of this equipment was available for testing by the plaintiff. We came pretty late to the game to do our testing. It was the first opportunity we had. We perform a test by certified industrial hygienists. We don't know exactly what Mr. Fisher did that night. We don't know the exact protocol, but we do have a fellow employee who said, this is the way that it is customarily done. That's Mr. Wortman. Mr. Duffy, an industrial hygienist, performed the testing. This testing showed that between .6 parts per million and 15 parts per million of Freon were liberated into the atmosphere. The OSHA safe limit is 1,000 parts per million. The testing was done on March 23, 2009. .46 to 1.5 parts per million is far less than the industry standard 1,000 safe limit. The industrial commission is not unreasonable in accepting a standard, generally accepted government OSHA testing limit. What if somebody is hypersensitive to Freon? I don't know if that's possible. I don't know if the evidence establishes there has to be certain concentrations. It is possible. Both doctors testified that an exposure to a susceptible person under 1,000 might trigger an event. But both of the doctors, both doctors said 15 is not enough. Was there any doctor who testified in this case that said the decedent died as a result of exposure to Freon? Dr. Kugel. But I criticize his findings because they are not based upon the testing. They're purely speculative. He said there is some number under 1,000 that could precipitate it. But at page, and it's a little strange pagination here with the record because they did it on both sides. Following page 103 of the record, the arbitrator points out that Dr. Kugel agreed with the cross-examination question that a trace amount of Freon over a long period of time would not cause sudden death and that a Freon level of 14 or 15 parts per million would not cause cardiac, would not cause sudden death. I apologize for the question on pagination, but after page 103. Counsel disagrees with the reconstruction that was done. But he introduced no contrary evidence. He could have done his own testing. We don't know. Maybe he did. All we have is .46 to 1.5 parts per million. The respondent's doctor, Dr. Carroll, says that could not have caused a precipitating cardiac event. He opines a plausible alternative theory, that this man did have a preexisting condition. He had an enlarged heart. He had thickening of the left ventricular wall. Which condition, just as likely, could have caused death absent Freon, absent the respondent, absent any connection with work whatsoever? That's as to exposure. Now, as to causal connection, I repeat, Dr. Kugel, as pointed out in the arbitrator's decision, said 14 or 15 wouldn't do it. Let's go back to the testing for one second. Put it into perspective. Let's imagine a football field. If zero parts per million is one goal line, the other goal line, a million parts per million, 15 parts per million would be the 1.5 yard line, and .46 parts per million would be the 6 inch line. The Industrial Commission is privileged to find that that small amount is insufficient to have triggered this man's cardiac arrhythmia. It is not an unreasonable medical decision for the Commission to weigh the medical evidence, the testimony of both doctors, and, importantly, the only evidence of Freon, and to conclude that there was no connection between the employment and this man's death. The plaintiff, of course, has the burden of proof. He does not carry his burden of proof by criticizing our testing. Instead of carrying his burden, he's asking this court to disregard the manifest way of the evidence and engage in speculation, surmise, and conjecture, all prohibited. You must take the evidence as it comes to you, giving deference to the Commission, particularly in medical questions. There is sufficient evidence here to sustain the findings of the Commission, the circuit court, and the arbitrator. We request that the decision be affirmed. Thank you, counsel. Number five? Yes. There is no speculation. In case in chief, that Dr. Opine, Dr. Kugel, that it was highly likely that the Freon decedent inhaled over one hour and 20 minutes, because it takes 40 minutes to evacuate each recovery bag. So there's three disconnections. There's only one reasonable inference drawn from the widow's testimony. It is not speculation. It is real exposure. And he actually inhaled some or all of the Freon contained in each disconnection in that hose connected to the empty recovery bag. There is no law that requires a specific level to be proven. If you find that, then I guess I lose. But the law says if this Freon was a causative factor in triggering this man's enlarged heart and caused sudden death, there is clear, convincing evidence from the medical expert, the plaintiff, and the engineer, and from the widow's testimony that's all undisputed and confirmed by the defendant's man who did the test on that day, three and a half years later. He does not have hoses without shutoff valves. His hoses, over 30 years, has shutoff valves. So what do you think it's designed for? To keep it contained? It's a smoking gun. Just to round this out, there is evidence in this record after this death. Sears does not permit their workers anymore to do this at their home. The refrigeration techniques that this decedent, it's done at a Sears facility under supervision. You can only come up with your own ideas why they don't want that anymore. But let's talk about, yes, plaintiff could have and chose not to do any testing ever. Why? Because when Mr. Ferroni went to the home to inspect the decedent's equipment, it was obvious, and if you look at his report, obvious. There was no testing that would have made anything. First of all, it would be complete speculation. Like defense said, we have no idea what the defendant did that night. Other than we can draw one reasonable inference, he did disconnect those hoses three separate times and he inhaled some or all of that Freon every time. But Mr. Ferroni obviously found the garage was unsafe to handle and operate Freon. It's not a safe environment. And the hoses that he possessed were unsafe and dangerous. And he contributed to his problem. That's why testing wasn't done. That's why there was no product liability case. That's why there was no need to test the equipment. Because it's irrelevant when the decedent contributed to his own demise, you're not going to have a product liability case. I am hoping you will see through the cloud that this low amount that the defendant recreated never addressed what the level of Freon would have been if they would have monitored and measured an immediate disconnection of the decedent's hose to that empty recovery bag the day they went out. But they either purposely or they mistakenly did not do that. They got the result they needed. They defended their own litigation. They didn't hire an independent company to come in because they controlled how the test was done, the manner, everything about it. They got the answer they did. And the commission shouldn't be rewarded for relying on a test that never addressed the unsafe conditions. This man died in the line of his duty for his job. He had to do this all the time. And it took one time to trigger that cardiac arrhythmia shortly after he finished that night, after two hours being in his garage. Thank you. Thank you, counsel, both for your arguments. The matter will be taken under advisement. A written disposition shall issue.